McDONALD, Justice.
Joshua Venckus was charged with sexual abuse in the second degree and acquitted. Following acquittal, Venckus filed this civil action against the police investigator, the prosecutors, and the municipalities that investigated and prosecuted the criminal case. Venckus asserted common law claims and state constitutional claims against the defendants. The defendants moved to dismiss Venckus's claims on the grounds the defendants were immune from suit, the claims were time barred, and the state constitutional claims were disallowed because an adequate nonconstitutional remedy existed. The district court denied the defendants' motions to dismiss, and we granted the defendants' applications for interlocutory appeal.
I.
This court reviews rulings on motions to dismiss for the correction of legal error. Godfrey v. State , 898 N.W.2d 844, 847 (Iowa 2017). To the extent that we review constitutional claims, the standard of review is de novo. See McGill v. Fish , 790 N.W.2d 113, 116-17 (Iowa 2010). In reviewing the ruling, "we accept all well-[pleaded] facts in the petition as true." Godfrey , 898 N.W.2d at 847.
II.
In February 2013, Venckus resided in Iowa City, Johnson County, Iowa. On the weekend of February 15-17, Venckus left Iowa City and spent the weekend at his parents' home in Chicago, Illinois. While Venckus was in Chicago, Venckus's roommates hosted a party at their residence. After the party ended, a man broke into the residence and sexually assaulted an intoxicated and incapacitated woman who had remained in the home. The woman managed to escape during the assault and obtain assistance.
Iowa City Police Department Investigator Andrew Rich was the principal investigator assigned to the case. The victim reported a single assailant. The police found a wallet outside a window well of the residence. The wallet belonged to Ryan Lee Markley. The police found Markley's handprint on the basement window used for entry. The police found a boot print matching Markley's boot on a chair underneath the window. The police recovered a *799 marijuana pipe stolen from the residence in Markley's apartment. Markley's DNA matched DNA found on the victim's body. However, DNA of "one single sperm found in the [victim's] cervix" matched Venckus's DNA.
The police interviewed Venckus and his roommates. All interviewees explained Venckus was in Chicago at the relevant time. To prove his alibi, Venckus turned over his cell phone and bank card to Rich. Venckus provided the names of alibi witnesses. Venckus also obtained an expert witness who accounted for the presence of Venckus's DNA. The assault occurred in Venckus's home. The blanket that covered the victim while she slept was from Venckus's bedroom, and the blanket was replete with Venckus's DNA. Venckus's expert witness report showed "the DNA evidence of one sperm found in the cervix represented evidence of a transfer from the blanket covering the victim and could not represent the sole evidence of DNA left by a rapist."
Rich arrested Venckus on January 24, 2014, on the charge of sexual abuse in the second degree. The affidavit supporting the arrest warrant provided as follows:
This Def[endant] stated during an interview that he was not even in [Iowa City] when the attack occurred. However, DNA evidence developed in the course of this investigation proves the Def[endant] was not only present but participate[d] in this attack and left the victim with multiple injuries requiring immediate medical attention.
The Johnson County Attorney's Office-specifically defendants Anne Lahey, Naeda Elliott, and Dana Christiansen-prosecuted the case. From August 2015 through the criminal trial in September 2016, Venckus's defense counsel uploaded exculpatory information onto a web-based file sharing service, which was made available to the police and prosecutors. The prosecutors took the case to trial. Venckus was acquitted.
Subsequently, Venckus filed the petition at issue. Venckus asserted claims against Investigator Rich and the City of Iowa City (collectively police defendants) for defamation, abuse of process, and malicious prosecution. Venckus asserted claims against Lahey, Elliott, Christiansen, and Johnson County (collectively prosecutor defendants) for abuse of process. Against all defendants, Venckus asserted tort claims arising under the Iowa Constitution, including violations of the following: the rights to freedom of movement and association under article I, section 1; the right to liberty arising under article I, section 1; the rights to due process, a fair trial, and equal protection guaranteed by article I, sections 6 and 9; and the right against unreasonable search and seizure guaranteed by article I, section 8.[1]
The defendants moved to dismiss the petition. The prosecutor defendants contended they were absolutely immune from suit. The police defendants contended they *800 were absolutely immune from suit, the plaintiff's claims were barred by the statute of limitations, and the state constitutional claims were disallowed because an adequate nonconstitutional remedy existed under the Iowa Municipal Tort Claims Act (IMTCA). The district court granted the motions to dismiss. Venckus filed a motion to reconsider. The district court granted the motion and denied in entirety the motions to dismiss.
III.
The prosecutor defendants contend they are absolutely immune from suit pursuant to the judicial process immunity. In resolving the argument, we first discuss the nature and scope of the judicial process immunity. We then determine whether the district court erred in denying the prosecutor defendants' motion to dismiss.
A.
To advance the practical administration of government, the law recognizes certain government officials should be absolutely immune from suit for conduct relating to the discharge of certain government functions. See Hlubek v. Pelecky , 701 N.W.2d 93, 96 (Iowa 2005) ("Absolute immunity ordinarily is available to certain government officials such as legislators, judges, and prosecutors acting in their official capacities ....").
One well-established immunity is the judicial process immunity. Under the judicial process immunity, government officials are absolutely immune from suit and damages for conduct "intimately associated with the judicial phase of the criminal process." Minor v. State , 819 N.W.2d 383, 394 (Iowa 2012) (quoting Imbler v. Pachtman , 424 U.S. 409, 430, 96 S. Ct. 984, 995, 47 L.Ed.2d 128 (1976) ). The judicial process immunity protects both government officials and their employing municipalities. See Moser v. County of Black Hawk , 300 N.W.2d 150, 152, 153 (Iowa 1981) (affirming dismissal of malicious prosecution claim against county based on county attorney's entitlement to absolute immunity); Burr v. City of Cedar Rapids , 286 N.W.2d 393, 396 (Iowa 1979) ("The public policy which requires immunity for the prosecuting attorney, also requires immunity for both the state and the county for acts of judicial and quasi-judicial officers in the performance of the duties which rest upon them ...." (quoting Gartin v. Jefferson County , 281 N.W.2d 25, 31 (Iowa Ct. App. 1979) )).
It is well established the judicial process immunity applies to common law torts, but it is a question of first impression whether the judicial process immunity applies to torts arising under the Iowa Constitution. In Baldwin v. City of Estherville , decided last term, we intimated the immunity would apply, noting "[c]onstitutional torts are torts, not generally strict liability cases." 915 N.W.2d 259, 281 (Iowa 2018). We further noted traditional immunities "could apply to state constitutional claims." Id. We did not decide the issue, however, because the issue was not directly presented. See id.
Now that the question is directly presented, we make explicit what was implicit in Baldwin : the judicial process immunity applies to state constitutional torts. This conclusion necessarily flows from the nature of the immunity itself. "When faced with a question of whether a government official has absolute immunity from civil liability ..., we employ a 'functional approach' to determine whether those actions 'fit within a common-law tradition of absolute immunity.' " Minor , 819 N.W.2d at 394 (quoting Buckley v. Fitzsimmons , 509 U.S. 259, 269, 113 S. Ct. 2606, 2613, 125 L.Ed.2d 209 (1993) ). "Under *801 this 'functional approach,' we do not look to the identity of the government actor, but instead to 'the nature of the function performed.' " Id. (quoting Forrester v. White , 484 U.S. 219, 229, 108 S. Ct. 538, 545, 98 L.Ed.2d 555 (1988) ); see Cleavinger v. Saxner , 474 U.S. 193, 201, 106 S. Ct. 496, 501, 88 L.Ed.2d 507 (1985) ("Absolute immunity flows not from rank or title or 'location within the Government,' but from the nature of the responsibilities of the individual official." (quoting Butz v. Economou , 438 U.S. 478, 511, 98 S. Ct. 2894, 2913, 57 L.Ed.2d 895 (1978) )). We grant absolute immunity for only
those governmental functions that were historically viewed as so important and vulnerable to interference by means of litigation that some form of absolute immunity from civil liability was needed to ensure that they are performed "with independence and without fear of consequences."
Rehberg v. Paulk , 566 U.S. 356, 363, 132 S. Ct. 1497, 1503, 182 L.Ed.2d 593 (2012) (quoting Pierson v. Ray , 386 U.S. 547, 554, 87 S. Ct. 1213, 1218, 18 L.Ed.2d 288 (1967) ).
The functional approach demonstrates the "[i]mmunity ... is not for the protection of the [official] personally, but for the benefit of the public." Beck v. Phillips , 685 N.W.2d 637, 643 (Iowa 2004). The immunity benefits the public by protecting government officials involved in "the judicial process from the harassment and intimidation associated with litigation." Minor , 819 N.W.2d at 394 (emphasis omitted) (quoting Burns v. Reed , 500 U.S. 478, 494, 111 S. Ct. 1934, 1943, 114 L.Ed.2d 547 (1991) ). The same public-interest considerations that justify the judicial process immunity apply whether the legal claims arise under common law or the state constitution. See Butz , 438 U.S. at 512, 98 S. Ct. at 2913 ("Absolute immunity is thus necessary to assure that judges, advocates, and witnesses can perform their respective functions without harassment or intimidation.").
We draw further support for our conclusion the judicial process immunity applies to state constitutional torts from analogous federal cases. The federal circuit courts unanimously hold the judicial process immunity applies to federal constitutional claims brought pursuant to Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics , 403 U.S. 388, 91 S. Ct. 1999, 29 L.Ed.2d 619 (1971). See Humphries v. Houghton , 442 F. App'x 626, 628-29, 629 n.5 (3d Cir. 2011) (per curiam) (stating absolute immunity for federal prosecutor applies to Bivens claims); Rodriguez v. Lewis , 427 F. App'x 352, 353 (5th Cir. 2011) (per curiam) ("Because Martinez was acting within the scope of his employment as a prosecutor during the sentencing hearing, he enjoys absolute immunity from Bivens liability."); Pangelinan v. Wiseman , 370 F. App'x 818, 819 (9th Cir. 2010) (holding absolute immunity applies to Bivens claims against federal judges and federal prosecutors); Nogueras-Cartagena v. U.S. Dep't of Justice , 75 F. App'x 795, 798 (1st Cir. 2003) (per curiam) ("The existence of absolute prosecutorial immunity is a matter of function .... In this instance, the challenged conduct ... was intimately associated with the judicial phase of the criminal process. It was, therefore, essentially prosecutorial in nature. Hence, immunity attaches." (Citations omitted.)); Blakely v. United States , 276 F.3d 853, 871 (6th Cir. 2002) (holding absolute immunity barred Bivens claim); Benson v. Safford , 13 F. App'x 405, 407 (7th Cir. 2001) (holding in Bivens action that "[p]rosecutors ... are absolutely immune from suits challenging conduct intimately associated with the criminal judicial process");
*802 Bolin v. Story , 225 F.3d 1234, 1242 (11th Cir. 2000) (per curiam) (holding absolute immunity applies to Bivens claims); Lyles v. Sparks , 79 F.3d 372, 376 (4th Cir. 1996) ("In Bivens -type actions, as at common law, prosecutors enjoy absolute immunity for conduct 'intimately associated with the judicial phase of the criminal process.' " (quoting Imbler , 424 U.S. at 430, 96 S. Ct. at 995 )); Thompson v. Walbran , 990 F.2d 403, 404 (8th Cir. 1993) (per curiam) (holding absolute immunity barred Bivens claim against a prosecutor); Daloia v. Rose , 849 F.2d 74, 75 (2d Cir. 1988) (per curiam) ("The prosecutor's activities in this case were all 'intimately associated with the judicial phase of the criminal process,' and he is therefore entitled to absolute immunity." (quoting Imbler , 424 U.S. at 430, 96 S. Ct. at 995 )); Tripati v. U.S. Immigration & Naturalization Serv. , 784 F.2d 345, 346-47 (10th Cir. 1986) (per curiam) (finding a U.S. attorney was absolutely immune from a Bivens claim).
Venckus appears to recognize the judicial process immunity applies here. Rather than distinguishing this case from our precedents, he asks us to do away with absolute immunity regardless of the source of the legal claim and instead adopt a rule of qualified immunity under the all-due-care standard set forth in Baldwin . See 915 N.W.2d at 279-81. In support of his position with respect to his constitutional claims, Venckus argues absolute immunity is inconsistent with the Iowa Constitution. With respect to all of his claims, Venckus argues prosecutorial misconduct and wrongful convictions are rampant and absolute immunity contributes to this because it gives government officials a wide berth to engage in misconduct.
We reject Venckus's request to do away with the judicial process immunity. First, with respect to his constitutional claims, it appears Venckus conflates two separate issues. The judicial process immunity is a common law immunity. It bars suit and damages against government officials for conduct intimately associated with the judicial process. It immunizes conduct without regard to the substantive source of the legal claim. In contrast, the all-due-care immunity set forth in Baldwin is a constitutional immunity. It bars suit and damages only for constitutional claims and only when the government official proves "that he or she exercised all due care to conform with the requirements of the law." Id. at 260-61. The Baldwin immunity is in addition to any other common law immunities or defenses available and not a comprehensive substitute immunity.
Second, Venckus offers no compelling justification to overrule our long-standing precedents holding the judicial process immunity applies to common law claims. "From the very beginnings of this court, we have guarded the venerable doctrine of stare decisis and required the highest possible showing that a precedent should be overruled before taking such a step." Kiesau v. Bantz , 686 N.W.2d 164, 180 n.1 (Iowa 2004) (Cady, J., dissenting), overruled by Alcala v. Marriott Int'l, Inc. , 880 N.W.2d 699, 708 & n.3 (Iowa 2016) ; see Hildreth v. Tomlinson , 2 Greene 360, 361 (Iowa 1849). Venckus has not established our prior decisions should be overruled. To the contrary, as discussed above, the judicial process immunity is of long standing in Iowa and was recently reaffirmed in Minor. See 819 N.W.2d at 397-99.
Third, with respect to all of his claims, Venckus's policy concerns are not new. In crafting the judicial process immunity over the course of time, our cases have considered the issues of prosecutorial misconduct, the risk of wrongful conviction, and the need for unencumbered judicial process. The cases have struck the right policy balance between these competing concerns. See *803 Gregoire v. Biddle , 177 F.2d 579, 581 (2d Cir. 1949) ("As is so often the case, the answer must be found in a balance between the evils inevitable in either alternative. In this instance it has been thought in the end better to leave unredressed the wrongs done ... than to subject those who try to do their duty to the constant dread of retaliation."). While the absolute immunity is necessary for the proper functioning of the judicial process, it does not give government officials carte blanche to engage in misconduct. The judicial process immunity is narrowly tailored to immunize only conduct "intimately associated with the judicial phase of the criminal process." See Minor , 819 N.W.2d at 394-95 (quoting Imbler , 424 U.S. at 430, 96 S. Ct. at 995 ). Further, there are other mechanisms that restrain official conduct, including vigorous judicial oversight in the district court, appellate review, postconviction-relief proceedings, attorney disciplinary proceedings, human resource management, and elections. As the Supreme Court explained,
[T]he safeguards built into the judicial process tend to reduce the need for private damages actions as a means of controlling unconstitutional conduct. The insulation of the judge from political influence, the importance of precedent in resolving controversies, the adversary nature of the process, and the correctability of error on appeal are just a few of the many checks on malicious action by judges. Advocates are restrained not only by their professional obligations, but by the knowledge that their assertions will be contested by their adversaries in open court. Jurors are carefully screened to remove all possibility of bias. Witnesses are, of course, subject to the rigors of cross-examination and the penalty of perjury. Because these features of the judicial process tend to enhance the reliability of information and the impartiality of the decisionmaking process, there is a less pressing need for individual suits to correct constitutional error.
Butz , 438 U.S. at 512, 98 S. Ct. at 2914 (footnote omitted). Against this regulatory backdrop, the abandonment of the absolute immunity in favor of qualified immunity is unnecessary to achieve Venckus's stated policy objectives. This is true without regard to the source of the legal claim.
For these reasons, we hold a government official is absolutely immune from suit and damages with respect to any claim arising out of the performance of any function intimately related to the judicial phase of the criminal process whether the claim arises at common law or under the state constitution.
B.
We next address the application of the judicial process immunity to the prosecutor defendants. The district court denied the prosecutor defendants' motion to dismiss on two grounds. First, with respect to the state constitutional claims, the district court appeared to hold the prosecutor defendants could assert only a qualified immunity rather than an absolute immunity. Second, the district court held the claim for abuse of process was not sufficiently developed and directed "the defendants to raise their defenses as to immunity again at an appropriate time when the actual facts underlying these allegations are more fully known." With one exception, which will be discussed below, we conclude the district court erred in denying the prosecutor defendants' motion to dismiss.
As discussed in the preceding section, the judicial process immunity applies to common law torts and state constitutional torts, and the district court erred in holding to the contrary. It is long-established the absolute immunity applies to the conduct *804 of prosecutors. In Blanton v. Barrick , we held prosecutors are entitled to absolute immunity related to the prosecution of criminal cases. See 258 N.W.2d 306, 309 (Iowa 1977) ("Clearly, as previously stated, prosecutors performing their official duties are quasi-judicial officials, not non-judicial functionaries and should be able to vigorously proceed with their tasks unhampered by the fear of unlimited civil litigation."). In subsequent cases, we adopted and applied a functional approach to conclude prosecutors are entitled to absolute immunity for activities "intimately associated with the judicial phase of the criminal process." Hike v. Hall , 427 N.W.2d 158, 159 (Iowa 1988) (quoting Imbler , 424 U.S. at 430, 96 S. Ct. at 995 ).
The district court also erred in concluding the claims against the prosecutor defendants were not sufficiently clear to resolve the prosecutor defendants' assertion of absolute immunity. Venckus's primary complaint is the prosecutor defendants continued a "reckless crusade" to convict Venckus in the face of "overwhelming evidence" of Venckus's innocence. Venckus argues the prosecutors refused to drop the charges because they did not want to admit they had charged an innocent man. However, the decisions to initiate a case and continue prosecution are at the core of the judicial process immunity. See Imbler , 424 U.S. at 430-31, 96 S. Ct. at 995 (1976) (finding "initiating a prosecution and ... presenting the State's case" were parts of the judicial process and necessitated immunity); Beck , 685 N.W.2d at 643 ("The decision to bring criminal charges is clearly 'intimately associated with the judicial phase of the criminal process' ...." (quoting Hike , 427 N.W.2d at 159 ; and Burr , 286 N.W.2d at 396 )); Hike , 427 N.W.2d at 160 (holding "a prosecutor's use of his authority to drop or continue pending criminal charges" was absolutely immune regardless of whether the charges had a basis); Blanton , 258 N.W.2d at 310 ("A public prosecutor acting in his official capacity is absolutely privileged to initiate, institute, or continue criminal proceedings." (quoting Restatement (Second) of Torts § 656, at 414 (Am. Law Inst. 1977) )). This is true without regard to motive or intent. The "immunity applies even when the [official] is accused of acting maliciously and corruptly because as a matter of policy it is in the public best interest that [officials] should exercise their function without fear of consequences and with independence." Blanton , 258 N.W.2d at 308 ; accord Beck , 685 N.W.2d at 642 ("Because we apply a functional analysis, immunity attaches even when the prosecutor is alleged to have acted for improper reasons.").
Much of the remainder of Venckus's claims relate to the prosecutor defendants' strategic and discretionary decisions regarding the prosecution of the case. Venckus challenges the prosecutors' decision to enter into a lenient plea agreement with Markley in exchange for Markley's testimony. Venckus challenges the prosecutors' subsequent decision to not call Markley as a witness despite the favorable plea agreement. Venckus challenges the prosecutors' decision to "shop" around for an expert witness to rebut Venckus's DNA expert. And Venckus challenges the prosecutors' evaluation of the alibi evidence presented.
None of this challenged conduct is actionable. Venckus admits all of the prosecutor defendants' challenged conduct occurred after the development of probable cause to arrest and charge Venckus. See Buckley , 509 U.S. at 274 n.5, 113 S. Ct. at 2616 n.5 ("The reason that lack of probable cause allows us to deny absolute immunity to a state actor for the former function (fabrication of evidence) is that *805 there is no common-law tradition of immunity for it, whether performed by a police officer or prosecutor. The reason that we grant it for the latter function (malicious prosecution) is that we have found a common-law tradition of immunity for a prosecutor's decision to bring an indictment, whether he has probable cause or not."). The decision to offer a plea bargain is necessarily a vital part of the judicial phase of the criminal process. See Hike , 427 N.W.2d at 160 (collecting cases for the proposition that a prosecutor's actions in the plea bargain process are absolutely immune). Similarly, "[t]he decision whether to call or not to call a given witness clearly falls within the scope of the immunity." Beck , 685 N.W.2d at 644 n.3 ; see Imbler , 424 U.S. at 426-27, 96 S. Ct. at 993 (stating absolute immunity insulates prosecutors from liability for calling witnesses who falsely testify). Likewise, the prosecutors' evaluation of the evidence is immune from legal challenge. See Buckley , 509 U.S. at 273-75, 274 n.5, 113 S. Ct. at 2615-17, 2616 n.5 (holding that prosecutor would be entitled to only qualified immunity for fabrication of evidence during the investigative phase prior to the development of probable cause and stating prosecutor's evaluation of evidence in trial is protected by absolute immunity).
The sole instance of alleged conduct falling outside the judicial process immunity is Venckus's allegation the Johnson County Attorney's Office filed an ethics complaint against Venckus's attorney for conduct in a different case solely to bully Venckus's attorney and distract him from the defense of the case. The filing of an ethics complaint against an attorney is not "intimately associated with the judicial phase of the criminal process." Beck , 685 N.W.2d at 645. For example, in Beck we held a prosecutor was not entitled to absolute immunity for writing letters to the police department and the mayor regarding a case. Id. at 644-45. The prosecutor in Beck was performing an "administrative function" and not acting in his capacity as an advocate within the judicial process and thus was not entitled to absolute immunity. Id. Similarly, although the nature of the ethics complaint is not in the record, the filing of the complaint was not within the judicial phase of the criminal process. Claims related to this allegation are not barred by the judicial process immunity.
C.
In sum, the district court erred in part in denying the prosecutor defendants' motion to dismiss. The judicial process immunity applies to both common law and state constitutional claims. The allegations in the petition against the prosecutor defendants were sufficiently specific to apply the judicial process immunity. The immunity bars all claims in the petition against the individual prosecutors and the county except for any claim relating to the ethics complaint filed against Venckus's attorney because that conduct was administrative in nature and not intimately associated with the judicial phase of the criminal process.
IV.
The police defendants also claim the district court erred in denying their motion to dismiss. The police defendants contend they are absolutely immune from suit. They also contend all claims against them are barred by the relevant statute of limitations. Finally, they claim Venckus's state constitutional claims were disallowed because an adequate nonconstitutional remedy existed under the IMTCA. We address each contention in turn.
A.
Like the prosecutor defendants, the police defendants contend the judicial process *806 immunity bars all claims asserted against them. The district court denied the police defendants' motion to dismiss on two grounds. With respect to the state constitutional claims, the district court appeared to hold that the judicial process immunity was not available and the police defendants could only assert the qualified-immunity defense set forth in Baldwin . With respect to the common law claims for defamation, malicious prosecution, and abuse of process, the district court held the claims were not sufficiently developed. The court directed the police defendants to raise their judicial-process-immunity defense again when the facts were more fully known. For the reasons set forth below, we conclude the district court erred in part in denying the police defendants' motion to dismiss.
Absolute immunity extends to police officer functions falling within the scope of the judicial process immunity, e.g., testifying as an ordinary witness. Cf. Minor , 819 N.W.2d at 397 (stating a social worker functioning as an ordinary witness is entitled to absolute immunity). As discussed above, this is true whether the claims arise under common law or under the state constitution. The district court erred in holding otherwise.
However, we cannot conclude the district court erred in denying the police defendants' motion to dismiss based on the judicial process immunity. Unlike the claims against the prosecutor defendants, the claims against the police defendants are not well defined. This is evidenced by the fact the parties spend much of their appellate briefing arguing about the factual bases for the claims against the police defendants. Moreover, the legal bases for the constitutional claims are not at all developed. As the police defendants noted in their motion to dismiss, "it is unclear from Venckus's petition how Rich allegedly violated his right to equal protection or right to a fair trial and due process." At oral argument, Venckus's counsel could not articulate the legal bases for some of the state constitutional claims. While the failure to present a coherent, cognizable cause of action might be cause to seek a more specific statement or an independent ground to dismiss Venckus's claim, those issues are not raised on appeal. See Iowa R. Civ. P. 1.421(1)(f ) (allowing for preanswer motion to dismiss for "[f]ailure to state a claim upon which any relief may be granted"); id. r. 1.433 ("A party may move for a more specific statement of any matter not pleaded with sufficient definiteness to enable the party to plead to it ....").
Ultimately, "[a] motion to dismiss a petition should only be granted if there is no state of facts conceivable under which a plaintiff might show a right of recovery." Kingsway Cathedral v. Iowa Dep't of Transp. , 711 N.W.2d 6, 7 (Iowa 2006). Here, the factual and legal bases for the claims against the police defendants are so vague as to be indeterminate-the immunity may or may not apply depending on the factual and legal bases for the claims. We will not piece through the petition and advance arguments the parties have not made. "Judges are not like pigs, hunting for [meritorious] truffles buried in [the record]." United States v. Dunkel , 927 F.2d 955, 956 (7th Cir. 1991) (per curiam). On the record presented, we believe an appropriate application of the functional analysis prohibits us from making a broad decision regarding the application of the judicial process immunity to the claims against the police defendants.
For this reason, we affirm the district court's denial of the motion to dismiss with respect to the police defendants' argument regarding the judicial process immunity.
*807 B.
The police defendants contend Venckus's claims are time-barred by the IMTCA, Iowa Code chapter 670 (2018). Iowa Code section 670.5 provides,
Except as provided in section 614.8, a person who claims damages from any municipality or any officer, employee or agent of a municipality for or on account of any wrongful death, loss, or injury within the scope of section 670.2 or section 670.8 or under common law shall commence an action therefor within two years after the alleged wrongful death, loss, or injury.
The district court appears to have denied the police defendants' limitations defense on the ground that further development of the record is necessary to meaningfully apply the limitations period. For the reasons expressed below, we conclude the district court erred in part.
Although frequently referred to as a statute of limitations, section 670.5 is a statute of creation. We explained this distinction in the seminal case of Montgomery v. Polk County :
Chapter [670[2] ] created a new right of action-one that was not available at common law nor available elsewhere by statutory authority, and therefore, while cases interpreting other limitation statutes are helpful, they do not control here. Truly chapter [670], and particularly the section which we are interpreting here, section [670.5], might be called a statute of creation, rather than a statute of limitation. The statute creates a new liability and provides for methods of enforcing the same, and by its terms fixes the time within which action for recovery may be commenced. It being a statute of creation, the commencement of the action within the time the statute fixes is an indispensable condition of the liability and of the action permitted. The time element is an inherent element of the right so created, and the limitation of the remedy is likewise a limitation of the right.
278 N.W.2d 911, 914-15 (Iowa 1979) (en banc) (quoting Sprung ex rel. Sprung v. Rasmussen , 180 N.W.2d 430, 433 (Iowa 1970) ). With that understanding, we held the time to file the action commenced upon the date of injury and not the date of accrual. See id. at 916-17.
Since Montgomery was decided in 1979, we have repeatedly held the IMTCA bars any claim not filed within the requisite time period as measured from the date of injury rather than date of accrual. See Rucker v. Humboldt Cmty. Sch. Dist. , 737 N.W.2d 292, 294 (Iowa 2007) ("[The IMTCA's statute of limitations] requires a plaintiff to file suit within two years from the date of injury."); Callahan v. State , 464 N.W.2d 268, 270 (Iowa 1990) (en banc) (holding the limitations period under the Iowa Tort Claims Act commences from the date of accrual in contrast with the IMTCA, which commences on the date of injury without regard to when the claim accrues); Uchtorff v. Dahlin , 363 N.W.2d 264, 266 (Iowa 1985) (en banc) (refusing to overrule Montgomery because the time period for commencing an action is governed by statute and the statute provides the date of injury is the relevant date); Orr v. City of Knoxville , 346 N.W.2d 507, 510 (Iowa 1984) (en banc) (adhering to rejection of the discovery rule); Farnum ex rel. Farnum v. G.D. Searle & Co. , 339 N.W.2d 392, 396 (Iowa 1983) (en banc) ("The trial court in the present case predicted that, *808 upon reconsideration, a majority of this court would now vote to overrule Montgomery and adopt the view of the dissenters in that case. This prediction is incorrect. The court adheres to the holding in Montgomery ....").
Most recently, in Doe v. New London Community School District , we again held the limitations period in section 670.5 commences on the date of injury. 848 N.W.2d 347, 353-54 (Iowa 2014). We explained, "[T]he IMTCA contains no term like 'accrues' to give the statute 'elasticity' for the court to consider 'when a cause of action "accrues." ' " Id. at 352 (quoting Montgomery , 278 N.W.2d at 914 ). We further noted the legislature amended the statute post- Montgomery and retained the date of injury as the relevant date and there was thus no reason to reconsider Montgomery :
In sum, on several occasions, we have discussed the pre-2007 version of section 670.5 and said it did not incorporate a common law discovery rule. We reached this conclusion based upon the absence of language like "accrue" or "accrual" in the IMTCA to suggest that something other than the date of injury might be the starting point for the statute of limitations. Especially given the further fact that section 670.5 has now been legislatively rewritten, we see no reason to disturb our longstanding precedent in this area.
Id. at 353-54 (citations omitted). One of the practical consequences of Montgomery , as reaffirmed in Doe , is that an action can be barred before the accrual date if the action was not filed within two years of the date of injury. See Farnum , 339 N.W.2d at 394, 396 (holding an action was barred by the limitations period where the time period to commence the action had passed prior to the accrual date).
Venckus does not contest the timeliness of his common law claims is governed by section 670.5, but he does dispute whether his state constitutional claims are governed by section 670.5. With respect to his constitutional claims, Venckus contends Iowa Code section 614.1(2) applies. That section provides for a two-year statute of limitations. Iowa Code § 614.1(2). However, that two-year limitations period commences on the date of accrual rather than injury and is subject to the discovery rule. See id. § 614.1. We disagree with Venckus's contention.
Claims arising under the state constitution are subject to the IMTCA. Iowa Code section 670.2(1) provides a "municipality is subject to liability for its torts and those of its officers and employees." Iowa Code section 670.1(4) defines a "tort" as "every civil wrong," including the "denial or impairment of any right under any constitutional provision." Section 670.4(2) provides the statutory remedies shall be exclusive. Our cases recognize the exclusivity of the IMTCA. See, e.g. , Rucker , 737 N.W.2d at 293 ("Iowa Code chapter 670 is the exclusive remedy for torts against municipalities and their employees."). Thus, the limitations period set forth in section 670.5 applies here.
Venckus contends we should ignore the text of the statute because application of the limitations period set forth in section 670.5 creates inconsistency in the law regarding the time to file constitutional claims against the state and its municipalities. Venckus notes constitutional claims against the state must be asserted within two years of the date the claim accrues, see Iowa Code § 669.13(1), whereas, under section 670.5, a claim must be filed within two years of the date of injury.
We are nonplussed regarding the distinction between the two limitations periods. We have long recognized and upheld *809 the distinction between the two limitations periods. The legislature has placed greater limitations on actions against municipalities compared to actions against the state because municipalities "operate under greater fiscal constraints than the state does" and municipalities have special problems with respect to formulating and implementing budgets. Farnum , 339 N.W.2d at 397. More than thirty-six years have passed since Farnum , and the legislature has continued to distinguish between claims against the state and municipalities. Venckus's purported inconsistency is actually a legislative policy decision of long standing. We see no reason to disturb the legislature's decision.
With that background, we apply the IMTCA to the claims presented. We first consider whether the IMTCA bars Venckus's claim for defamation. "To establish a prima facie case in a[ ] defamat[ion] action, a plaintiff must show the defendant (1) published a statement that was (2) defamatory (3) of and concerning the plaintiff." Bierman v. Weier , 826 N.W.2d 436, 464 (Iowa 2013) (second alteration in original) (quoting Taggart v. Drake Univ. , 549 N.W.2d 796, 802 (Iowa 1996) ). The date of injury for a defamation claim is the date on which "the defendants performed their last allegedly ... defamatory act." Crouse v. Iowa Orthopaedic Ctr. , No. 03-1626, 2005 WL 1224577, at *4 (Iowa Ct. App. May 25, 2005). The only statement attributable to the police defendants is the statement made in conjunction with Venckus's arrest. The petition was filed more than four years after that statement. We thus conclude section 670.5 bars Venckus's defamation claim.
With respect to the remainder of Venckus's claims, we agree with the district court that the record is not adequate to evaluate the limitations defense. "A defendant may raise the statute of limitations by a motion to dismiss if it is obvious from the uncontroverted facts contained in the petition that the applicable statute of limitations bars the plaintiff's claim for relief." Turner v. Iowa State Bank & Tr. Co. of Fairfield , 743 N.W.2d 1, 5 (Iowa 2007). Where the nature of the claim or the pertinent factual allegations are unclear, further development of the record may be necessary. See id. With the exception of the defamation claim discussed above, the same difficulties precluding resolution of the police defendants' absolute-immunity argument preclude resolution of their limitations defense-namely, the factual and legal bases for the claims are underdeveloped. We thus conclude the district court did not err in denying the motion to dismiss with respect to the remainder of the claims.
C.
The police defendants argue Venckus's state constitutional claims are not cognizable because the IMTCA allows for adequate remedies. Specifically the police defendants contend the IMTCA allows for jury trial, compensatory damages, and punitive damages. The district court concluded the IMTCA did not preempt Venckus's state constitutional claims.
We conclude the district court did not err in denying the police defendants' motion. The IMTCA "does not expand any existing cause of action or create any new cause of action against a municipality." Iowa Code § 670.4(3). Instead, the Act allows people to assert claims against municipalities, their officers, and their employees that otherwise would have been barred by the doctrine of sovereign immunity. See Thomas v. Gavin , 838 N.W.2d 518, 521 (Iowa 2013) (explaining the IMTCA abolished sovereign immunity). The substance of any legal claim asserted under the IMTCA must arise from some *810 source-common law, statute, or constitution-independent of the IMTCA. The mere existence of the IMTCA itself does not provide any remedy that would preclude the recognition of a state constitutional claim. While there might be common law causes of action or statutory causes of action that would provide a remedy sufficient to warrant disallowance of the state constitutional claims, those arguments are not advanced here. Further, as noted above, the record with respect to Venckus's claims against the police defendants is not sufficiently developed to justify dismissal at this point.
For these reasons, the district court did not err in denying the police defendants' motion to dismiss on this ground.
D.
Finally, the police defendants argue a claim for malicious prosecution will not lie against the police defendants because (1) there was probable cause to charge Venckus and (2) the prosecutors had exclusive control of the case. The police defendants did not directly present the issue to the district court, and the district court did not directly rule on the issue. It is not preserved for appellate review. See Meier v. Senecaut , 641 N.W.2d 532, 537 (Iowa 2002) ("It is a fundamental doctrine of appellate review that issues must ordinarily be both raised and decided by the district court before we will decide them on appeal."). Given that the issue was not directly presented to or decided by the district court, prudence dictates further development of the record. We need not address the issue further.
E.
In sum, we conclude the district court erred in part in denying the police defendants' motion to dismiss. The district court erred in concluding Baldwin displaced the judicial process immunity. The district court erred in denying the police defendants' motion to dismiss Venckus's defamation claim. The district court did not err in denying the police defendants' motion to dismiss on the remaining grounds.
V.
The district court erred in part in denying the defendants' respective motions to dismiss. We remand this matter for further proceedings not inconsistent with this opinion. We express no view on the merits or demerits of the claims, immunities, defenses, or other issues to be litigated after remand and upon development of the record.
AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.
All justices concur except Appel, J., who dissents.

In Godfrey v. State , this court held the State of Iowa and state officials acting in their official capacities could be sued directly for violations of the equal protection and due process clauses of the Iowa Constitution but only where state law does not otherwise provide an adequate damage remedy. 898 N.W.2d at 846-47 ; id. at 880-81 (Cady, C.J., concurring in part and dissenting in part). The parties have not asked us to reconsider Godfrey , to consider whether a Godfrey -type claim can be asserted for alleged violations of the Iowa Constitution other than those recognized in Godfrey , or to determine whether Godfrey -type claims can be asserted against municipalities. In the absence of any argument on these issues, we assume without deciding Venckus has asserted cognizable constitutional claims for damages.

The IMTCA was moved from Iowa Code chapter 613A to Iowa Code chapter 670 by the Code editor in 1993.